UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:10-CV-31

GARY VANDER BOEGH                                             PLAINTIFF

V.

ENERGY SOLUTIONS, INC., et al.                              DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court upon Energy Solutions, Inc.'s (DN 39), Paducah

Remediation Services, LLC's (DN 46), and Bechtel Jacobs Company LLC's (DN 47) motions

for summary judgment.  These matters have been fully briefed and are now ripe for adjudication.

For the following reasons, Defendants' motions (DN 39, DN 46, and DN 47) are GRANTED.

## BACKGROUND

Plaintiff Gary Vander Boegh ("Plaintiff") brought suit against the defendants for alleged

whistleblower retaliation under the Energy Reorganization Act ("ERA"), the False Claims Act

("FCA"), and a number of various environmental statutes[1] after his employment as the landfill

manager at the Paducah Gaseous Diffusion Plant (the "Plant") ended in 2006.

In 1998, the United States Department of Energy ("DOE") contracted with Defendant

Bechtel Jacobs Company ("BJC") to serve as the Management and Integration ("M & I")

Contractor at the Plant.  As the M & I Contractor, BJC was responsible for the Plant's nuclear

enrichment program and the site's environmental management.  Pursuant to the contract between

BJC and the DOE, BJC subcontracted out blocks of scope work that were formerly managed

---

[1] Reincorporating the same facts that make up the basis of his ERA retaliation claim, Plaintiff
alleges retaliation under the whistleblower protection provisions of the following environmental
statutes: The Solid Waste Disposal Act, 42 U.S.C. § 6971; the Clean Water Act, 33 U.S.C. §
1367; the Safe Drinking Water Act, 42 U.S.C. § 300j-9(i)(2)(B)(ii); and the Toxic Substances
Control Act, 15 US.C.§ 2622.

directly by DOE contractor Lockheed Martin.  Employees of Lockheed Martin were transitioned to BJC on April 1, 1998 when the BJC contract began and were termed "Grandfathered Employees."  Thereafter, the Grandfathered Employees were transitioned from BJC to BJC's chosen subcontractors.

In February 2000, BJC subcontracted to WESKEM, LLC ("WESKEM") the waste management and disposal work for the Plant.  This included the operation of the C-746-U Landfill (the "Landfill") which was used to dispose of waste materials generated at the Plant. Plaintiff, who was previously employed by Lockheed Martin, transitioned to BJC in the role of Landfill Manager.  Once BJC subcontracted the operation of the Landfill to WESKEM, Plaintiff's employment was transitioned to WESKEM.  As the Landfill Manager, Plaintiff was the highest-ranking employee on site at the Landfill.  The Landfill could not accept waste if a certified landfill manager was not present.  The Kentucky Division of Waste Management ("KDWM") required key personnel disclosure statements for the Landfill Manager position.

While employed by WESKEM as the Landfill Manager, Plaintiff made several complaints concerning leachate storage capacity and leachate leakage from the Landfill. Beginning February 2, 2001, Plaintiff sent several emails to BJC and WESKEM officials concerning the lack of reserve leachate tank space and the potential problems that could create for the operation of the Landfill.  DN 47-3 at p. 2; DN 48-65 at p. 5.  In response to what Plaintiff perceived to be adverse employment actions motivated by the complaints, Plaintiff filed whistleblower retaliation complaints with the DOE Contractor Employee Protection Program, 10 C.F.R. Part 708 ("Part 708 Complaints), against BJC and WEKSEM on January 4, 2002.  DN 48-65 at p. 3.  In the July 11, 2003 Initial Agency Decision, the DOE Hearing Officer found that the following complained-of acts were retaliatory: (1) a March 5, 2001 disciplinary

2

memorandum from WESKEM Project Manager Dan Watson; (2) a 2001 decision not to provide additional office space to Plaintiff and his support staff at the U Landfill; (3) an August 2001 proposal to relocate Plaintiff's office from the U Landfill to the Plant site; (4) a reduction in Plaintiff's support staff; (5) a proposed subcontract change notice considered in March 2002 which would have affected Plaintiff's position as the landfill manager; (6) ongoing acts of harassment and intimidation by BJC personnel, specifically Kevin Barber;[2] and (7) a 2001 annual performance evaluation.  DN 48-65 at p. 14-39  With respect to Plaintiff's complaint of a proposed subcontract change, the Hearing Officer directed BJC to refrain from recommending any changes with respect to Plaintiff's job position for a period of one year from the date of the Initial Agency Decision.  DN 48-65 at p. 65.  All of Plaintiff's retaliation complaints were either concluded, settled, or dismissed by 2008.[3]

In 2003, as a part of a new strategy to increase its small business contracting, the DOE decided to re-bid the DOE work at the Plant as two small business set-aside work scopes and issued a Request for Proposals ("RFP").  Defendant Paducah Remediation Services ("PRS") and Northwind Corporation were among the companies that submitted bids in response to this RFP.  Northwind Corporation, which named WESKEM as the subcontractor in its bid, was named as the successful bidder to take over the contract.  After a protest was filed against the award to

---

[2] Although the DOE found that Barber's actions may constitute harassment and intimidation of Plaintiff for his protected activity, the DOE additionally found that there was no need to provide part 708 relief to Plaintiff with respect to this issue because BJC showed that Barber's aggressive conduct towards Plaintiff were remedied.  DN 48-65 at p. 30-31.

[3] The Final Agency Decision, dated December 18, 2007, concluded that all of the actions determined to have been retaliatory should have been time barred from consideration with the exception of the 2001 performance review.  DN 47-3.  With respect to the 2001 performance review, the Final Agency Decision reversed the Hearing Officer's finding that Plaintiff was harmed by the review.  *Id*.  Thus, the Final Agency Decision reversed the remedial actions ordered by the Hearing Officer in the Initial Agency Decision.  *Id*.  On July 16, 2008, the DOE dismissed Plaintiff's petition for Secretarial Review.  DN 47-4.

Northwind Corporation, the DOE rescinded the contract and reissued the RFP.  In response to

this renewed RFP, Northwind Corporation and PRS were again among the companies that

submitted bids in August 2005.  The DOE awarded the contract to PRS in December 2005.

PRS subcontracted with Duratek Federal Services, Inc. ("Duratek") to prepare the waste

management portion of its August 2005 bid.  Kevin Barber, a former BJC employee who had

become a Duratek employee in 2003, was one of the Duratek employees assigned to help prepare

the August 2005 PRS bid.  As part of this assignment, Barber drafted a section of the bid related

to waste management disposition and waste calculations.  Plaintiff contends that, in the bid,

Barber described the future landfill manager to mirror himself.  Although Barber was not

explicitly named in the bid, the bid proposal identified a "State of Kentucky Certified Landfill

Manager with 12 years of experience coming to the job."  DN 48-37.  According to an

unidentified and undated OSHA document presented by Plaintiff, this person was identified

through interviews as Barber.  *Id*.  However, Barber testified that he did not recall including such

language in the bid and did not recall discussing its inclusion with anyone.  Barber Depo., DN

46-4 at p. 6-8.  Instead, Barber testified that he explicitly followed the DOE RFP specifications

as directed.  *Id*. at p. 6-7.  Barber stated that he never expressed an interest in obtaining the

landfill manager position at the Plant.[4]  However, Paul Corpstein stated that Barber had visions

of himself becoming the Landfill Manager, but left the company before the end of 2005.

Corpstein Statement to OSHA, DN 48-51 at p. 5.

BJC's contract, and therefore WESKEM's subcontract, was scheduled to terminate on

April 23, 2006.  Beginning in January 2006, PRS engaged in a transitional period so it could be

---

[4] Barber testified that he quit his job at BJC in 2003 because his son was born and died in a
hospital in Paducah.  *Id*. at p. 10.  Because of this, he realized his family would never have
medical care if they remained in Paducah and sought to leave the city.  *Id*.  Barber then became
an employee of Duratek in Oak Ridge, Tennessee.

4

ready to assume management of the Plant on April 24, 2006.  PRS subcontracted with Duratek to take over the waste management duties previously performed by WESKEM.  Duratek later became Energy Solutions, Inc. ("Energy Solutions"), the defendant in this case.  As part of the transitioning process, PRS-Energy Solutions worked with BJC-WESKEM to transition the landfill management and operations from WESKEM to Energy Solutions.

In January 2006, Energy Solutions employee John Kelly was assigned as a project manager for material disposition responsible for facilitating the transition.  Kelly Depo., DN 40-4 at p. 7.  Kelly was the highest-ranking authority for Energy Solutions on site during the transition and oversaw five other employees including Paul Corpstein and Matt LeBarge.  *Id*. at p. 8.  Kelly testified that he was the sole person responsible for selecting an individual to be the certified landfill manager at the Plant.  DN 40-4 at p. 12.  Kelly further testified that when he arrived on site in January 2006, there was no preconceived idea about whether the landfill manager would be filled by an existing Duratek/Energy Solutions employee, the existing WESKEM landfill manager, or by an open search for the position.  *Id*. at 12-13.  According to Kelly, he received no direction from any superiors in this regard.  *Id*. at 13.  Additionally, Kelly testified that no one suggested that Plaintiff not be considered for the landfill manager position.  *Id*. at p. 16.

According to Energy Solutions, a decision was made to offer Corpstein the landfill manager position sometime from mid-February to the first week of March.  During the transition process, Corpstein was responsible for landfill activities, including landfill procedures and permits.  *Id*. at p. 9-10.  After working closely with Corpstein, Kelly began to envision Corpstein as a candidate for the landfill manager position by the end of February.  *Id*. at p. 15.  Corpstein, in his affidavit, stated that he expressed an interest in the landfill manager position within a few weeks of arriving on site.  Corpstein Affidavit, DN 40-5 at ¶ 7.  Before making the decision,

Kelly conferred with James Hopper, Kelly's immediate supervisor. Hopper Affidavit, DN 40-2 at ¶ 10. Hopper endorsed Kelly's decision to hire Corpstein as the landfill manager based on Corpstein's experience and credentials. *Id*. To the best of Mr. Hopper's knowledge, no one other than Corpstein was considered or interviewed for the landfill manager position.[5] *Id*. at ¶ 11.

According to Corpstein, he was verbally offered the landfill manager position by Kelly by mid-February 2006, but did not sign a contract until the second week of April. DN 40-5 at ¶ 7. Corpstein, who did not hold a required Kentucky Licensed Landfill Manager certification at the time he was offered the position, began the process of applying for the necessary classes and approvals from the Kentucky Division of Waste Management ("KDWM") by March 9, 2006. DN 40-5 at ¶ 9. On March 21, 2006, Corpstein received a letter from the KDWM indicating that his application for the required class was approved. *Id*. at ¶ 10. The DOE submitted the required disclosures naming Corpstein as the Interim Landfill Manager on April 13, 2006.[6] *Id*. at Ex. 3. On April 19, 2006, Corpstein received a letter from the KDWM indicating that he was approved as the Interim Landfill Manager at the Plant's landfill until he could complete the required class. *Id*. at ¶ 11. Corpstein attended the required training class on May 17-19, 2006 and obtained his Kentucky Licensed Landfill Manager certification on May 26, 2006. *Id*. at ¶ 12.

---

[5] It is disputed whether or not Plaintiff applied for the Landfill Manager position. According to Plaintiff, PRS-Duratek advertised for the position as a "Field Engineer" which included the position of Landfill Manager after the date Kelly contends he selected Corpstein for the position. Plaintiff did interview for a Field Engineer position, but stated that he was not willing to take any job other than the Landfill Manager position. Vander Boegh Deposition, at p. 188:9-14.

[6] The KDWM required the DOE to submit key personnel disclosure statements for the Landfill Manager position at the Plant. A May 24, 2004 letter from the KDWM stated that it will require an Applicant Disclosure Statement from the DOE prior to the Hazardous Waste Permit Reissuance and the U Landfill modification. DN 40-6. The letter further stated that the DOE must update the disclosure statement for the solid waste landfill manager if any of the information is outdated. *Id*.

6

With respect to Plaintiff, Kelly testified that he was familiar with him by seeing his name listed on an organizational chart and by attending a meeting where Plaintiff was present, but had never had an individual interaction with him.  DN 40-4 at p. 17-18.  Kelly testified that, at the time of his decision to hire Corpstein as the landfill manager, he was not aware of any complaints, grievances, or employee concerns asserted by Plaintiff against BJC or WESKEM or filed with the DOE or the United States Department of Labor.  *Id*. at p. 18-19.  Kelly testified that he was also unaware of any safety, regulatory compliance, or other concern raised by Plaintiff regarding the leachate capacity at the landfill or any other matter.  *Id*. at 12-20.  Additionally, Kelly testified that no one from BJC, WESKEM, the DOE, or PRS attempted to influence his hiring decision in any manner.  *Id*. at 21.

On February 24, 2006, Plaintiff filed another DOE Employee Concerns Program whistleblower complaint against BJC, PRS, and the DOE alleging that these entities were conspiring to ensure that he was not allowed to continue in his employment because of his previous protected disclosures.  Specifically, Plaintiff complained that BJC, PRS, and the DOE conspired to coerce him into accepting waste in violation of DOE waste acceptance criteria, permit documents, and Kentucky Administrative Regulations.  DN 48-58 at p. 1.  Plaintiff further complained that BJC, PRS, and the DOE were not complying with his requests to prepare key personnel disclosure statements, which he alleged was a violation of the DOE's July 11, 2003 Initial Agency Decision.  DN 48-58 at p. 2-3.  After engaging in extensive discovery and before this case went to an administrative hearing, Plaintiff removed this action to this Court pursuant to 42 U.S.C. § 5851(b)(4).

**SUMMARY JUDGMENT STANDARD**

7

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## ANALYSIS

## I.   <u>Standards for ERA and FCA Retaliation Claims</u>

Plaintiff has asserted whistleblower retaliation complaints against Defendants under the Energy Reorganization Act ("ERA"), the False Claims Act ("FCA"), and other various environmental statutes.  The ERA prohibits employers from discriminating against any employee "with respect to his compensation, terms, conditions, or privileges of employment because the employee" engaged in a protected whistleblowing activity.  42 U.S.C. § 5851(a).  "The FCA

protects 'whistleblowers' who pursue or investigate or otherwise contribute to a qui tam action, exposing fraud against the United States government." *McKenzie v. BellSouth Telecommunications*, 219 F.3d 508, 513 (6th Cir. 2000); see 31 U.S.C. §§ 3729-3730.  Pursuant to the FCA,

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged . . . . or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

> 31 U.S.C. § 3730(h).

Plaintiff's retaliation claims are analyzed under the *McDonnell-Douglass* burden-shifting framework.  *See Hasan v. United States Department of Labor*, 298 F.3d 914, 916 (10th Cir. 2002); *Scott v. Metropolitan Health Corp.*, 234 Fed. Appx. 341, 346 (6th Cir. 2007); *Sasse v. United States Department of Labor*, 409 F.3d 773, 779 (6th Cir. 2005) ("To state a claim under the whistleblower provision of an environmental statute, the plaintiff must establish that his employer retaliated against him because he engaged in a protected activity.").  Thus, to establish a prima facie case of retaliation, Plaintiff must show the following by a preponderance of the evidence: (1) he engaged in a protected activity under the applicable statute; (2) his employer or the entity from which he sought employment knew of this protected activity; (3) his employer or the entity from which he sought employment took some adverse action against him; and (4) a causal connection between the protected activity and the adverse action.  *Balmer v. HCA, Inc.*, 423 F.3d 606, 613-14 (6th Cir. 2005), *abrogated on other grounds by Fox v. Vice*, 131 S. Ct. 2205 (2011).

If Plaintiff successfully establishes a prima facie case of retaliation, the burden shifts to his employer who must assert a legitimate, non-retaliatory reason for the adverse employment action. *Balmer*, 423 F.3d at 614. Under the ERA, the employer must ultimately prove that it would have taken the same unfavorable personnel action in the absence of the protected activity by clear and convincing evidence. *Trimmer v. U.S. Dept. of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999). *See* C.F.R. § 24.109(b). Under the FCA and the other environmental statutes, the employer must show this by a preponderance of the evidence. *Simon v. Simmons Foods, Inc.*, 49 F.3d 386, 389 (1995). If the employer meets this burden, the burden is shifted back to Plaintiff who must prove not only that the employer's proffered reason for the adverse employment action was a pretext, but that the real reason for the employer's action was intentional retaliation. *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). However, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000).

## II.  Energy Solutions' Motion for Summary Judgment

Defendant Energy Solutions contends that summary judgment is appropriate because Plaintiff cannot establish a prima facie case of retaliation under the ERA, the FCA, or the various environmental statutes. Energy Solutions further contends that Plaintiff cannot prevail on his retaliation claim under the FCA because he was never employed by Energy Solutions and therefore lacks standing to bring such a claim.

### a.  Evidence to be Considered

In its reply in support of its motion for summary judgment, Energy Solutions contends that Plaintiff failed to oppose its motion with admissible evidence. Pursuant to Federal Rule of

Civil Procedure 56(c)(1)(A), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  The Rule further provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on person knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Unsworn declarations may be considered as evidence only if signed as true under penalty of perjury and dated.  28 U.S.C. § 1746; *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994).  If a party fails to properly address another party's assertion of fact in accordance to Rule 56(c), the court may do one of the following: "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or (4) issue any other appropriate order."  Fed. R. Civ. P. 56(e).

Plaintiff, throughout his response, cites to an unsigned and undated affidavit which he filed as an attachment to his response (DN 42-1).  Plaintiff additionally cites to certain exhibits to the affidavit which he did not file as attachments to his response.  Energy Solutions contends that its motion for summary judgment should be granted because Plaintiff's unsigned and undated declaration is insufficient and ineligible for consideration by the Court.  Plaintiff's unsigned and undated affidavit attached to his response to Energy Solution's motion for summary judgment (DN 42-1) must be excluded from consideration.  However, Plaintiff has filed the same Affidavit as an attachment to his response to the other defendants' motions for summary judgment.  DN

48-2 and DN 49-2). These Affidavits are signed under penalty of perjury and dated. *Id*. at p. 50. Pursuant to Rule 56, the Court may consider materials in the record other than those cited in Plaintiff's response. Fed. R. Civ. P. 56(c)(3). Accordingly, the Court will not consider the affidavit attached to Plaintiff's response to Energy Solutions' motion for summary judgment, but will consider the affidavits attached to Plaintiff's response to the other defendants' motions for summary judgment.

### b. Plaintiff's Prima Facie Case of Retaliation

Energy Solutions does not dispute that Plaintiff engaged in a protected activity and that he suffered an adverse employment action; however, it contends that Plaintiff cannot meet the second and fourth elements of a prima facie case of retaliation. Specifically, Energy Solutions contends that Plaintiff cannot show that his employer knew of his protected activity because the person responsible for hiring the landfill manager, John Kelly, did not know of Plaintiff's whistleblower complaints or safety concerns at the time he decided to hire Corpstein as the landfill manager at the Plant. Thus, Energy Solutions argues that Plaintiff cannot establish a causal connection between his protected activities and the decision not to hire him. In response, Plaintiff argues that (1) the relevant decision to remove him as landfill manager was made in August 2005 and not when Kelly hired Corpstein, and that (2) Kelly knew of Plaintiff's protected activities and/or was influenced by others who knew of Plaintiff's protected activities.

### i. When Decision was Made

The decision-maker's knowledge of Plaintiff's protected activities is an essential element of his prima facie case of retaliation. *Frazier v. USF Holland, Inc*., 250 Fed. Appx. 142, 148 (6th Cir. 2007) (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002)). Without showing that the decision-maker knew of his protected activities, Plaintiff cannot show a causal

connection between his protected activities and his termination.  Before determining whether the relevant decision-maker had knowledge of Plaintiff's protected activities, the Court must determine whether there is a genuine issue of material fact regarding when the decision to hire Paul Corpstein, and thus not to hire Plaintiff, was made.  Plaintiff contends that, for purposes of determining whether Energy Solutions had knowledge of his protected activities, the inquiry should focus on two separate decision points: (1) the decision to remove him as landfill manager and to replace him with Barber, as evidenced by the August 2005 PRS bid; and (2) the decision to hire Corpstein.

Plaintiff cannot show that the inclusion of the certified landfill manager's qualifications mirroring Barber's own qualifications in the August 2005 PRS bid constituted a decision to terminate Plaintiff.  Even considering the evidence in the light most favorable to Plaintiff, Plaintiff has not presented more than a scintilla of evidence to support his position.  Besides an excerpt from an unidentified and undated OSHA document which stated that the landfill manager described in the bid was identified through interviews as Barber, Plaintiff has presented no other admissible evidence to support his position that the decision was made in August 2005 to replace him with Barber.[7]  Plaintiff failed to present any evidence that Barber was told to draft the landfill manager qualifications in such a way so as to mirror himself and to exclude the possibility of Plaintiff continuing in the landfill manager position.  Further, although Plaintiff contends that the language included in the bid would have been approved by higher PRS and Duratek/Energy Solutions management (Plaintiff's Declaration, DN 48-2 at ¶ 44), Plaintiff has

---

[7] In his declaration, Plaintiff includes several inadmissible hearsay and double-hearsay statements regarding Barber being chosen to replace Plaintiff as landfill manager.  Declaration, ¶ 62 ("[Brian Bell] said that one of the DES employees, Paul Corpstein, during the waste meeting, indicated, 'that he had hired Kevin Barber.'") and ¶ 65 ("[Kendal Holt and Andy Crabtree] had jokingly indicated, 'Barber was going to take my job.'").

neither identified the "higher management" nor presented any evidence that the language was reviewed or approved by higher management. Finally, even if Barber purposefully drafted the landfill manager's qualification to mirror his own, Plaintiff has not shown that its inclusion precluded him from obtaining the landfill manager position in the event that PRS-Duratek/Energy Solutions was awarded the bid from the DOE. Accordingly, Plaintiff cannot establish that Barber and the higher management of PRS and Duratek/Energy Solutions were the relevant decision-makers with respect to the decision to not hire Plaintiff as the landfill manager.

Thus, the Court will focus its inquiry on whether there is a genuine issue of material fact as to whether John Kelly knew of Plaintiff's protected activities at the time he made the decision to hire Corpstein. For purposes of Plaintiff's retaliation claims, the relevant point in time for determining whether the decision-maker knew of Plaintiff's protected activities is the time of the *decision* to hire Corpstein. If the decision-maker had no knowledge of Plaintiff's protected activities at the time the decision was made, it follows that the decision-maker did not have the requisite retaliatory intent for Plaintiff to succeed on his retaliation claims. Thus, the decision-maker's knowledge of Plaintiff's protected activities at the time the hiring process was finalized, when Corpstein signed the contract or when PRS's contract at the Plant officially began, is immaterial.

Energy Solutions contends that Kelly, who was solely responsible for the decision of who to hire to fill the landfill manager position, did not have knowledge of Plaintiff's protected activities until after he made the decision to hire Corpstein in mid- to late- February 2006. According to Corpstein, he was verbally offered the position by Kelly by mid-February 2006, but did not sign a contract until the second week of April. DN 40-5 at ¶ 7. Corpstein, who did not hold a Kentucky Licensed Landfill Manager certification at the time he was offered the position,

began the process of applying for the necessary classes and approvals from the Kentucky Division of Waste Management ("KDWM") by March 9, 2006.  DN 40-5 at ¶ 9.  Kelly disavowed any knowledge of Plaintiff's protected activities, testifying that he was not aware of any complaints, grievances, safety concerns, or employee concerns voiced by Plaintiff against BJC, WESKEM, the DOE, PRS or any other entity when he made the decision to assign Corpstein to the landfill manager position.  Kelly Deposition, DN 40-4 at p. 18-20.

In response, Plaintiff contends that Energy Solution's position that the decision to hire Corpstein was made in mid to late February 2006 is refuted by PRS's April 3, 2006 disclosure to KDWM wherein PRS stated that "Continuation or change in the certified Landfill Manager and certified Landfill Operator will be addressed after hiring with subsequent submittal of the required disclosure statements."  DN 48-41.  Plaintiff further contends that defendant's position is refuted by evidence that the landfill manager position was listed on PRS's website as late as March 14, 2006 (DN 48-47) and April 3, 2006.  The March 14, 2006 listing did list a "Certified Landfill Manager" as an open position.  DN 48-47.  However, it appears that the April 3, 2006 listing was for a Field Engineer.  Plaintiff Email to Rick Penpek, DN 48-50 at p. 2.  Plaintiff asserts that the landfill manager position would fall under the listed Field Engineer position; however, the defendants dispute that this job listing was for the landfill manager position.  When Plaintiff interviewed for the position, he was told several times that it was not an interview for the landfill manager position.  LaBarge DOL Interview, DN 48-50 at p. 9-10.

Although Corpstein did not sign a contract for the landfill manager position until the second week of April, the evidence shows that the *decision* was made to offer the position to him much earlier.  The evidence shows that the decision was made by March 9, 2006 at the latest, when Corpstein applied for the necessary classes and approvals from the KDWM.  There is also

evidence that the decision was made several weeks earlier.  Charlene Roberts, a PRS manager, contacted the KDWM on February 22, 2006 to advise it that PRS may have someone else for the Landfill manager and Landfill Operator position.  LaBarge DOL Interview, DN 48-50, at p. 4; Plaintiff's Response to PRS's Motion for Summary Judgment, DN 48 at p. 8-9.  PRS's April 3, 2006 disclosure statement does not refute the defendant's position regarding when the decision to hire Corpstein was made, as it reflects PRS's position that it was not involved in the hiring decision and the fact that Corpstein had not signed the contract for the landfill manager position. Although Corpstein did not sign a contract until the second week of April, the decision was already made to hire him, as evidenced by his applications for the necessary class and approvals. Additionally, even assuming that the Field Engineer position included the landfill manager position, the job postings alone are not sufficient to show that the decision to hire Corpstein was not made until after Kelly learned of Plaintiff's protected activities in mid to late March.  The listings were shown on the PRS website; however, the website listing and the evidence shows that it was Energy Solution's responsibility to hire the landfill manager.  The job listings remaining on the PRS website after the decision was made to hire Corpstein, but before Corpstein signed a contract the second week of April, is not inconsistent with Energy Solutions' position that it had already made the decision to hire Corpstein.  Accordingly, the decision to hire Corpstein was made by March 9, 2006 at the latest.

    ii. <u>Whether the Decision-Maker Knew of Plaintiff's Protected Activities at the Time the Decision was Made</u>

   Plaintiff contends that Kelly had either actual or imputed knowledge of Plaintiff's protected activities prior to the time he decided to hire Corpstein, and that Kelly was influenced by others with knowledge of Plaintiff's protected activities.  Typically, a plaintiff proceeding under the *McDonnell-Douglass* analysis will be able to produce direct evidence that the decision

16

making officials knew of the plaintiff's protected activity; however, knowledge of a protected

activity may be shown by circumstantial evidence. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th

Cir. 2002). "Under a federal test of the sufficiency of circumstantial evidence, an inference must

not be based on conjecture, speculation, or mere possibility." *Menne v. Celotex Corp.*, 861 F.2d

1453, 1463 (10th Cir. 1988).

In support of Plaintiff's position that Kelly had actual or imputed knowledge of

Plaintiff's protected activities at the time the decision to terminate him or to hire Corpstein was

made, Plaintiff points to the following evidence:

1. A February 13, 2006 meeting with the PRS transition team including Corpstein and Steve Davis where Plaintiff raised the issue of leachate storage.

2. A February 14, 2006 meeting with PRS managers John Razor and Mike Spry where Plaintiff informed them that he had a section 708 complaint open. During this meeting, Plaintiff directed Razor and Spry to his 10 CFR Part 708 ECP claim on the DOE website. Plaintiff then raised his leachate leakage concerns. Plaintiff additionally asked Razor how he would know to file his application for the landfill manager position. In response, Plaintiff contends Razor told him to "be sure to watch the PRS job postings listed on their website." Plaintiff Declaration at ¶ 73(b). According to Razor, he told Plaintiff to submit an expression of interest for any position that he felt interested in and for which he qualified. DN 48-57. Plaintiff sent a follow-up letter to Razor and Spry on February 17, 2006, documenting the February 14, 2006 conversation.

3. A February 24, 2006 meeting, with Kelly present, wherein Plaintiff raised concerns regarding the filing of required landfill key personnel disclosure statements. After raising his concerns, Plaintiff was informed that the disclosure statements were not being discussed at this meeting.

4. A March 10, 2006 memorandum from Plaintiff to Razor and Spry wherein he referred to the leachate storage tank deficiencies and treatment plant design deficiencies. DN 48-48.

5. Kelly's interview with OSHA wherein he stated that he learned about leachate concerns in mid- to late- March or early April. DN 48-49.

6. Matt LaBarge's interview with OSHA wherein he said that he directly reported to Kelly, that he saw emails from Plaintiff addressing the leachate problem, and that he knew Plaintiff issued a stop work order on March 15, 2006. Additionally,

> LaBarge stated in the interview that Kelly was aware of Plaintiff's leachate concerns prior to April 24, 2006 because Plaintiff was raising the issues in his emails.  DN 48-50.

In sum, Plaintiff argues that Kelly had knowledge of his protected activities because individuals who had actual knowledge of Plaintiff's protected activities worked with or around Kelly, such as Corpstein, Barber, LaBarge, Razor, and Spry.  For example, Plaintiff argues that because Barber, who was a primary subject of Plaintiff's Part 708 complaint, reported to Corpstein, and Corpstein worked closely with Kelly during the transition process, there is reason to conclude that knowledge of Plaintiff's whistleblower status would have been communicated from the bottom up.  DN 42 at p. 25.  With respect to the February 13, 2006 meeting where Plaintiff raised his concerns regarding leachate storage, Plaintiff states that there is "certainly reason to infer that Corpstein would have communicated the content of meeting" to Kelly.  With respect to Plaintiff's February 14, 2006 communications with Razor and Spry, Plaintiff states that "there is reason to conclude that knowledge of whistleblower status would have been communicated to Kelly from the top down" after this meeting.  Additionally, Plaintiff argues that Kelly "should have known" of his protected activities due to Kelly's admitted role of performing due diligence during the transition process and information regarding Plaintiff's complaints posted by the DOE on the internet.

In *Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999), a Title VII retaliation case, the plaintiff alleged that she was terminated in retaliation for participating in an investigation into complaints of discrimination.  The plaintiff argued that because an individual present at the investigation spoke to the decision-maker shortly after the investigation and before the decision-maker decided to terminate the plaintiff, a reasonable jury could infer that the decision-maker was told that the plaintiff participated in the investigation.  *Id.* at 1354-55.  "But

because 'could have told' is not the same as 'did tell,'" the Court of Appeals found that it would be pure speculation to infer that the decision-maker was actually told of the plaintiff's protected activity.  *Id*. at 1355.  Accordingly, the plaintiff did not present sufficient evidence to establish that the decision-maker was aware of her protected conduct.  *Id*. at 1356.

Likewise, here, Plaintiff has suggested that Kelly "could have" or even "should have" discovered or been told of his protected activities because of his contact with others who knew of his protected activities.  However, such an inference would be purely speculative based upon the evidence in the record.   Kelly has testified that he was not aware of Plaintiff's protected activities prior to the time he made the decision to hire Corpstein, and that he did not become aware of Plaintiff's protected activities or his leachate concerns until mid- to late-March or early April.  DN 48-49 at p. 2.  "[W]here the decision maker denies having knowledge of the alleged protected activity, the plaintiff must do more than offer only conspiratorial theories or flights of fancy, speculations, hunches, intuitions or rumors."  *Cain v. Potter*, 2006 WL 3146435 at *4 (N.D. Ohio Oct. 31, 2006) (internal quotations omitted).  Plaintiff has presented no evidence from which a trier of fact could infer that this disavowal of knowledge is inaccurate.  To survive a motion for summary judgment, Plaintiff must present more than speculations or intuitions. *Mulhall*, 287 F.3d at 552 (holding that the plaintiff failed to establish that the decision-maker knew of his protected activities where plaintiff did not produce any evidence, direct or circumstantial, to rebut evidence that the decision-maker had no knowledge and plaintiff offered "only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56"); *see Proffit v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 150 Fed. Appx. 439, 443 (6th Cir. 2005).

Plaintiff also argues that knowledge of his protected activities should be imputed to Kelly because other individuals with actual knowledge of his protected activities influenced Kelly's decision. Knowledge of a plaintiff's protected activities may be imputed to a decision-maker in certain circumstances. In *Gordon v. New York City Board of Education*, 232 F.3d 111 (2d Cir. 2000) and *Henry v. Wyeth Pharmaceuticas*, 616 F.3d 134 (2d Cir. 2010), the Court of Appeals for the Second Circuit addressed situations where a corporate agent carries out an adverse employment action on the explicit or implicit *orders* of, or pursuant to the *encouragement* of, a superior with knowledge of the plaintiff's protected activities. However, here, Kelly testified that he received no direction from any superiors with respect to hiring a landfill manager. Kelly Depo., DN 40-4 at p. 13. Plaintiff has presented no evidence refuting this assertion.

Knowledge of a plaintiff's protected activities may also be imputed to a decision maker under the "cat's paw" theory. The Sixth Circuit has explained that, "[i]n the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Roberts v. Principi*, 283 Fed. Appx. 325, 333 (6th Cir. 2008) (citing *Llampallas v. Mini-Circuits, Lab, Inc*., 163 F.3d 1236, 1249 (11th Cir. 1998)). In such a situation, "the retaliator is the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the retaliator's discriminatory animus." *Id.* (internal quotations omitted). "However, when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." *Id.*

Here, Plaintiff contends several of the defendants and/or the defendants' employees influenced or had substantial input into the decision not to hire him for the landfill manager

20

position, including the following: (1) Barber and those managers who helped prepare the August 2005 proposal, Corpstein, and LaBarge of Energy Solutions; (2) Razor and Spry of PRS; (3) and BJC.  Decision-maker Kelly testified that no one from BJC, WESKEM, PRS, or the DOE suggested Plaintiff not be considered for the position or attempted to influence or provide input into the hiring decision.  *Id*. at p. 6, 20-21.  After thoroughly examining the record, the Court finds that Plaintiff has not presented any evidence, other than mere speculations, to rebut this testimony.

Plaintiff contends that, because Barber was familiar with his whistleblowing and was found to have retaliated against Plaintiff in 2002, the "fact that Barber himself was inserted into Vander Boegh's job certainly supports the inference that Barber had some influence on that decision."  DN 42 at p. 27.  It is undisputed that Barber was actually aware of Plaintiff's protected activities.  However, even considering the evidence in the light most favorable to Plaintiff and assuming that Barber purposefully inserted a description of himself into the August 2005 bid proposal, Plaintiff has failed to put forth any evidence to show that this act influenced Kelly's decision not to hire Plaintiff.  Kelly testified that there was no preconceived idea about whether he would hire an existing Duratek employee, retain the existing landfill manager, or conduct an open search for the position.  Kelly Deposition, DN 40-4 at p. 12-13.  Additionally, Barber had not worked at the Plant since 2003 and was no longer a Duratek employee by the time Kelly arrived at the Plant for the transition process in January 2006.  Accordingly, there is no genuine issue of material fact as to whether Kelly was influenced by Barber.  Likewise, because Plaintiff has put forth no evidence that the unidentified Duratek or PRS managers who worked on the August 2005 bid influenced Kelly's decision, there is no genuine issue of material fact as to whether Kelly was influenced by these managers.

Next, Plaintiff contends that Corpstein influenced Kelly's decision not to hire Plaintiff for the landfill manager position.  In support of this argument, Plaintiff points out that Corpstein was Barber's immediate supervisor, Corpstein attended a February 13, 2006 meeting wherein Plaintiff raised leachate storage concerns, and Corpstein worked closely with Kelly.  However, besides indicating that Corpstein *could have* communicated with Kelly regarding Plaintiff's protected activities, Plaintiff has presented no evidence that Corpstein *did* communicate with Kelly or otherwise influenced Kelly's decision.  Accordingly, there is no genuine issue of material fact as to whether Kelly was influenced by Corpstein.

Plaintiff contends that LaBarge influenced Kelly's decision not to hire him as the landfill manager.  LaBarge informed a DOL investigator that he remembered "a conversation early on there were issues raised related to my understanding about dealing with Mr. Vander Boegh when I got up there."  DN 48-50 at p. 10.  LaBarge also testified that he knew of Plaintiff's February 14, 2006 meeting with Razor and Spry through second-hand channels.  *Id*. at p. 4.  LaBarge was also knew of Plaintiff's stop work order on March 15, 2006 due to leachate concerns.  *Id*. at p. 5.  However, Plaintiff has presented no evidence that LaBarge communicated with the Kelly regarding Plaintiff's protected activities or  influenced Kelly's decision in any manner.

Plaintiff next contends that PRS, specifically Razor and Spry, influenced Kelly's decision not to hire Plaintiff as the landfill manager.  Although it is undisputed that PRS managers Razor and Spry had actual knowledge of Plaintiff's protected activities by mid-February, there is insufficient evidence to show that PRS had substantial input into or influence over the decision not to hire Plaintiff.  First, Plaintiff has not presented evidence of any communication between the PRS managers and Kelly.  Instead, Plaintiff contends only that there is reason to infer the PRS managers would have told Kelly.  Second, even if PRS "allowed" Barber to work on the

August 2005 bid proposal, this cannot show that PRS influenced the decision not to hire

Plaintiff.  Barber was not an employee of PRS.  Additionally, there is insufficient evidence to

show that PRS was aware of Plaintiff's protected activities in August 2005.  In Plaintiff's

February 2006 retaliation complaint, Plaintiff stated that: "On Tuesday, February 14, 2006, due

to my concerns that PRS officials were unaware of the unresolved 10 CFR 708 complaints and

the conflicting 'Operator' information, I decided to schedule a meeting with Mr. Razor."  DN 48-

64 at p. 3.  Thus, "allowing" Barber to work on the August 2005 bid proposal does not show that

PRS influenced the decision.  Further, approving and submitting the portion of the proposal

drafted by Barber and Duratek-Energy Solutions is consistent with PRS not having the

responsibility of choosing the landfill manager.  Accordingly, Plaintiff cannot show that PRS

made the decision not to hire Plaintiff for the landfill manager position or that PRS influenced

the decision not to hire Plaintiff.

Finally, Plaintiff contends that BJC influenced Kelly's decision not to hire him as the

landfill manager by interfering with Plaintiff's ability to retain his position.  As evidence of

BJC's influence and interference, Plaintiff highlights the following evidence:

(1) BJC failed to timely transmit Plaintiff's key disclosure statements to the KDWM as the future landfill manager at the time of the anticipated 2006 contract transition.

(2) BJC failed to identify Plaintiff to PRS and Duratek as a grandfathered employee, or an employee with the right of first refusal for the landfill manager position.

(3) During the January to April 2006 transition period, BJC and PRS had several meetings and it was likely that some of the BJC managers who worked with PRS during this time were some of the people who had expressed dissatisfaction or concerns about Plaintiff.  Plaintiff further contends that Kelly would have been involved in these transition meetings and would have been aware of the fact that BJC was withholding Plaintiff's key disclosure statements.

(4) During the transition period, BJC personnel communicated false derogatory information regarding Plaintiff to PRS and Duratek, including spreading false rumors that Plaintiff's security clearance was about to be rescinded and that Plaintiff had a potential for work place violence.

(5) BJC attempted to coerce Plaintiff into a violation of the operational requirements for accepting high volumes of waste without adequate available operational personnel and falsely accused Plaintiff of not approving landfill waste acceptance packages.

Plaintiff argues that these statements and acts would have been known by either Kelly or his subordinates and would have influenced Kelly's decision not to hire Plaintiff.

The Court finds that the evidence in the record does not support Plaintiff's position that BJC influenced Kelly's decision not to hire him.  With respect to Plaintiff's allegation that BJC failed to submit his key personnel disclosure statements to the KDWM, Plaintiff has not shown that it was BJC's responsibility to do so.  WESKEM President John Krueger testified that he alerted BJC to the fact that when you turn over landfill operations from one contractor to another and there is a landfill manager change, a notification of the changes must be made to the KDWM by law and that "somebody needs to tell PRS that they've got to make this notification . . . ."  Krueger Depo., DN 49-66 at p. 34-35.  After raising the issue a second time to no avail, Krueger stopped pressing the issue and was "under the impression that they would take care of it."  *Id*. at p. 37.  However, Krueger clarified that it was his impression that BJC felt it was not their job to make the disclosures, but that it was the responsibility of the new operator coming in to take care of the disclosure.  *Id*. at p. 48-49.  KRS § 224.40-330 expressly states that the "applicant" must submit a disclosure statement prior to the issuance, renewal, or transfer of a permit for a solid waste management facility.  Thus, it was not BJC's responsibility to submit the key personnel disclosure statements.  Additionally, Plaintiff has failed to present any evidence that BJC somehow prevented PRS from filing the required disclosures.

Plaintiff next alleges that BJC failed to identify him as a grandfathered employee to PRS. BJC has admitted that Plaintiff was a grandfathered employee during the 1998 contract transition from Lockheed Martin to BJC.  In the employee information list BJC provided to PRS, Plaintiff is specifically identified as grandfathered ("GF") for pension-related purposes.  Schifferer Declaration, DN 47-12 at p. 17.  Kelli Schifferer, the former BJC Human Resource Manager and the current custodian of BJC records relating to personnel and employee relations, stated that the employee information list was provided to PRS on April 6, 2006.  Schifferer Declaration, DN 47-12 at ¶ 5.  Thus, BJC did inform PRS of Plaintiff's grandfathered status.  Nevertheless, this does not necessarily mean that Plaintiff was a grandfathered employee under the contract between the DOE and PRS.  As proof that Plaintiff was a grandfathered employee under the contract between the DOE and PRS, Plaintiff has presented a DOE letter concerning an Employee Concern of another individual by the name of John Bobo.  That letter states that, under the PRS contract, employees are eligible to receive a preference in hiring for vacancies for non-managerial positions if they are grandfathered employees who are on the rolls of BJC's first and second tier subcontractors at the Paducah site at contract transition.  DN 48-25 at p. 1.  Even if Plaintiff qualified as a grandfathered employee, it was not BJC's responsibility to recognize this right or to ensure that Duratek-Energy did so.  Furthermore, even if PRS and Duratek-Energy Solutions failed to recognize Plaintiff's grandfathered status, their failure to do so has no bearing on whether Kelly had knowledge of Plaintiff's protected activities.

Plaintiff next alleges that BJC managers likely communicated about Plaintiff and his protected activities during transitional meetings with PRS.  However, such speculations cannot defeat a motion for summary judgment.  *See Mulhall*, 287 F.3d at 552.  Plaintiff has not identified or provided evidence of who may have had these alleged conversations, the topics of

such conversations, or when such conversations may have taken place.  Furthermore, James Kannard, an employee of Bechtel National, Inc. who temporarily performed services on BJC's behalf as the Project Site Manager at the Plaint during 2006, stated that BJC directed its managers to refrain from discussing current site employees with the management of PRS or Energy Solutions.  Kannard Affidavit, DN 47-8 at ¶ 6.  Accordingly, a trier of fact cannot infer that these possible conversations influenced Kelly's decision not to hire Plaintiff as the landfill manager.

Plaintiff next alleges that workplace rumors spread by BJC influenced Kelly's decision not to hire Plaintiff.  However, Plaintiff has presented no evidence that Kelly heard such rumors or was aware of such rumors, or that the rumors influenced Kelly's decision.  Mr. Krueger, in response to a question regarding his knowledge of derogatory remarks made about Plaintiff to PRS or Duratek, responded that he did not know if that occurred.  DN 49-66 at p. 47.  When asked whether anyone at BJC tried to influence PRS or Duratek in the hiring decisions for the landfill manager position, Mr. Krueger testified that he did not know of any such occurrence and that he did not find such an occurrence to be likely because BJC did not have a vested interest in who became the landfill manager.  *Id*. at p. 49.  Accordingly, there is no evidence that rumors regarding Plaintiff influenced Kelly's decision.

Lastly, Plaintiff alleges that BJC attempted to coerce Plaintiff into a violation of the operational requirements for accepting high volumes of waste without adequate available operational personnel and falsely accused Plaintiff of not approving landfill waste acceptance packages.  However, Plaintiff does not explain how this alleged coercion influenced Kelly's decision not to hire him as the landfill manager.  There is no evidence that Kelly knew of the alleged coercion or accusations, or that he considered them in his decision.  Accordingly, there is

no evidence that BJC's alleged coercion or accusations regarding accepting waste influenced Kelly's decision not to hire Plaintiff.

In sum, Plaintiff has presented no evidence, other than speculations and conspiratorial theories, to show that Kelly knew of Plaintiff's protected activities or was influenced by others with knowledge of his protected activities. Instead, the record suggests that Kelly independently made the decision to offer the landfill manager position to Corpstein, an existing Duratek/Energy Solutions employee, after working closely with him during the transition process. Because Plaintiff cannot establish this essential element of a prima facie case of retaliation, Energy Solutions is entitled to summary judgment on Plaintiff's retaliation claims under the ERA, the FCA, and the various environmental statutes. Accordingly, the Court need not address Energy Solution's argument that Plaintiff lacks standing to bring a retaliation claim under the FCA.

**III. <u>Paducah Remediation Services' Motion for Summary Judgment</u>**

PRS contends that it is entitled to summary judgment because it was not involved in the hiring process for the landfill manager position and took no action, direct or indirect, regarding the landfill manager position. PRS additionally contends that there is no evidence to support a finding that it was a joint employer of the landfill manager and therefore, it cannot be held liable for any alleged discrimination regarding the decision of who to hire for the position. Finally, PRS contends that it is entitled to summary judgment on Plaintiff's FCA retaliation claim because Plaintiff was not its employee. The Court previously determined that Plaintiff cannot establish a prima facie case of retaliation against Energy Solutions because he has not presented evidence from which a trier of fact could infer that Kelly had knowledge of his protected activities. However, Plaintiff alternatively contends that PRS, which had actual knowledge of his protected activities, made the decision not to hire Plaintiff.

PRS contends that it was the sole and exclusive responsibility of Energy Solutions to determine who would fill the landfill manager position.  In support of its argument that it had no role in the decision not to hire Plaintiff, PRS points to the contract between it and Duratek-Energy Solutions, which provides, in part:

3. RESPONSIBILITIES

Duratek will complete all work assignments in accordance with the technical direction provided by the PRS functional lead.  It will be the sole responsibility of Duratek to assign a project or program manager for each task, project or program under which they are working.  Duratek will communicate this to PRS prior to initiating work on each assignment.

Affidavit of Brenda Jones, Subcontract, DN 46-2 at p.  9.  Brenda Jones, who served as an attorney for PRS, states in an affidavit that the landfill manager was an employee of Energy Solutions, received all supervision and directions from Energy Solutions, and was paid by Energy Solutions.  DN 46-2.

In response, Plaintiff contends that PRS made the decision not to hire Plaintiff.  As evidence of that PRS made the decision, Plaintiff points to the following evidence:

(1)  During his meeting with Razor and Spry of PRS, Plaintiff alleges that he asked Razor how he would know when to file his job application for the landfill manager position.  According to Plaintiff, Razor responded by telling him to watch the PRS job postings listed on the PRS website.  Plaintiff contends that, at this time, Razor did not disclaim that the decision as to who would be hired as landfill manager would not be the decision of PRS and did not refer Plaintiff to Duratek.

(2)  PRS posted the landfill manager position on its website on March 14, 2006 and April 3, 2006.  Plaintiff further clarifies that the position listed was a field engineer position, under which Plaintiff claims the landfill manager position would fall.[8]   Plaintiff applied for and was interviewed for this position.

---

[8] The defendants dispute that this job listing was for the landfill manager position.  When Plaintiff interviewed for the position, he was told several times that it was not an interview for the landfill manager position.  According to LaBarge, who interviewed Plaintiff, Plaintiff expressed that he was not interested in the field engineer position and was not responsive to questions regarding the field engineer position.  LaBarge DOL Interview, DN 48-50 at p. 9-10.

> However, Plaintiff was told at the interview that it was not the landfill manager position.
>
> (3) PRS sent Key Personnel Disclosure Statements to the KDWM which referenced that "Continuation or change in the certified Landfill Manager and Landfill Operator will be addressed after hiring." According to Plaintiff, this is evidence that PRS considered itself the party responsible for making the decision to hire a landfill manager.
>
> (4) PRS's name was on the landfill signs at the facility in April 2006.
>
> (5) PRS allowed Barber to help draft the August 2005 PRS proposal in response to the DOE's RFP, approved the bid proposal, and submitted the bid proposal to the DOE.

DN 48 at p. 18-19.

The evidence in the record is not sufficient to show that PRS was responsible for the decision not to hire Plaintiff. The significance of  landfill-related jobs being listed on PRS's website is severely undermined by the fact that, when Plaintiff interviewed for one such job, he was interviewed by LaBarge, an employee of Duratek/Energy Solutions. No PRS employees were present at the interview. LaBarge DOL Interview, DN 48-50 at p. 7. Furthermore, LaBarge informed Plaintiff during this interview that it was not an interview for the landfill manager position. According to LaBarge, the landfill manager position was not formally posted through the PRS process. LaBarge DOL Interview, DN 48-50 at p. 4. Likewise, PRS' Key Personnel Disclosure statement to the KDWM is insufficient to show that it considered itself responsible for hiring the landfill manager. The sentenced highlighted by Plaintiff does not state that PRS itself would make the decision; instead, the sentence is consistent with Duratek/Energy Solutions having the responsibility of making the decision.

Plaintiff cannot show that PRS made the decision not to hire him as the landfill manager. Further, as discussed above, Plaintiff cannot show that PRS influenced or had substantial input into the decision not to hire Plaintiff. Accordingly, there exist no genuine issue of material fact

and PRS is entitled to summary judgment on Plaintiff's retaliation claims under the ERA, the FCA, and the various environmental statutes.  Accordingly, the Court need not address PRS' argument that it is entitled to summary judgment on Plaintiff's FCA retaliation claim.

## IV. <u>Bechtel Jacobs Company's Motion for Summary Judgment</u>

BJC contends that it is entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff cannot establish a prima facie case of retaliation.  BJC further contends that it is entitled to summary judgment on Plaintiff's FCA retaliation claim because Plaintiff was not a BJC employee at the time of any retaliatory conduct.  In response, Plaintiff contends that there are genuine issues of material fact regarding BJC's role in the decision as to who would serve as the landfill manager after the 2006 contract transition and whether PRS-Duratek/Energy Solutions would have failed to hire Plaintiff absent his protected activities and communications from BJC to PRS about Plaintiff's protected activities.  The Court has already determined that BJC did not influence or have substantial input into the decision not to hire Plaintiff as the landfill manager.  Accordingly, Plaintiff cannot establish a prima facie case of retaliation against BJC and BJC is entitled to summary judgment on Plaintiff's retaliation claims under the ERA, the FCA, and the various environmental statutes.  The Court therefore need not address BJC's argument that it is entitled to summary judgment on Plaintiff's FCA retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendants Energy Solutions, PRS, and BJC are entitled to summary judgment on Counts I, II, and III of Plaintiff's complaint.  Accordingly, Defendants' motions for summary judgment (DN 39, DN 46, and DN 47) are GRANTED.

30